Taft, J.,
dissenting. Two questions of law are presented by this record. The first is whether the Probate Court had jurisdiction to make the order of July 16, 1943, approving the application of the administrator de bonis non for authority to .compromise and settle all claims against the surety of the deceased executor and give that surety a general release from all liabilities under its bond. If it did have that authority, then the second question arises whether Grant Haserodt, as administrator de bonis non, is entitled to call upon the equity power of the court to vacate that order of July 16, 1943, because it was made under a misapprehension as to existing material facts. As the majority opinion states, no fraud was attributable to the administrator de bonis non and there is no evidence of fraud on the part of the surety.
On July 16, 1943, the administrator de bonis non filed an application with the Probate Court which read in part:
“Your petitioner further represents that it would be to the best interests of the said estate to accept the said sum of $1,950 in. full settlement of the estate’s claim against the said surety company and therefore *393 seeks authority from this-, honorable court for permission to accept and execute and deliver such releases as may- be necessary to fully settle and compromise and release the said American. Surety Company from any and all additional liabilities under it's said bond.” (Emphasis added.)
On July 16, 1943, the Probate Court made a journal entry providing in part:
“The court further finds that a liability exists and that the American Surety Company is liable for assets received and not accounted for by the said P. H. Wieland and does further find that the said American Surety Company in full settlment and compromise,of its liability agrees to pay to the estate of Bobert Gray, deceased, the sum of * * * $1,950 which the court finds to be fair, equitable and just and does further find that,the said claim should be settled and compromised for the sum of $1,950 and,does further find that upon payment of the said sum the said American Surety Company should be fully and completely released and discharged from any further and additional liabilities under its bond.
- “It is, therefore, ordered, adjudged and decreed that Grant H. Haserodt, as administrator de bonis non with the will annexed, of. the estate of Bobert Gray, deceased, be and is hereby given full power and authority to settle and compromise the claim of Bobert Gray, -against the American Surety Company for the sum of $1,950; and that upon receipt of 'the payment of the said sum Grant H. Haserodt, as administrator de bonis non,.with the. will annexed, of the estate of Bobert Gray, deceased, is hereby given full power to execute and deliver any and all releases which may be necessary to discharge the American Surety Company from any further liabilities under the. said bond. It is .further .ordered,, adjudged and decreed that upon payment of the said sum.of $1,950 by thp *394 American Surety Company, its bond hereinbefore executed, delivered and approved by this court in the estate of Robert Gray, deceased, be and the same is hereby discharged and released from any further liability under its said bond.” Emphasis added.)
It is apparent from Section 10509-23, General Code, that on his appointment the administrator de bonis non was vested with power to enforce as a claim of the estate the obligations of the surety on the bond of the deceased executor. See United States Fidelity & Guaranty Co. v. Decker, Admr., 122 Ohio St., 285, 171 N. E., 333.
Section 10509-72, General Code, as amended effective August 22, 1941, reads so far as pertinent:
"On application of an executor or administrator for authority to compromise and settle a claim in favor of or against a decedent’s estate, the Probate Court, upon hearing on such application, and after reasonable notice thereof has been given to all persons who would be adversely affected thereby as determined by the court, may authorise or direct the executor or administrator to compromise and settle such claim on such terms and conditions as the court deems to be for the best interest of the estate. The court may dispense with the notice of such hearing if it deems notice to be unnecessary.” (Emphasis added.)
The section, as it had theretofore existed, was applicable only “when a debtor of a deceased person is unable to pay all his debts.”
Therefore, on July 16, 1943, Section 10509-72, General ' Code, apparently fully authorized the Probate Court to make the order which it made on the application' of the administrator de bonis non for authority to compromise and settle the claim in favor of the decedent’s estate against the surety company on the deceased executor’s bond.
*395 No statute has been called to our attention which, indicates that Section 10509-72, General Code, should not apply to “a claim in favor of * * * a decedent’s estate ’ ’ merely because it is a claim against the surety of a former deceased executor or administrator of that estate. If the General Assembly intended to impose any such limitation on the meaning of the words which it used, it certainly failed to use any words from which that intention can be inferred.
Sections 10506-26 to 10506-28, inclusive, General Code, are only designed to provide a means whereby, on the filing of a new bond, a new surety is to answer for the conduct of the fiduciary after the filing of the new bond and the old surety is to remain answerable for the fiduciary’s conduct during the time prior to the filing of the new bond.
Thus, although Sections 10506-26 and 10506-27, General Code, do provide that the court may order the “release” of a.surety in certain instances, those sections must be read in the light of Section. 10506-28, General Code, which states that ‘ ‘ such original surety * * * shall be liable for said fiduciary’s acts only from the time of executing the original bond to the filing and approval by the court of. the new bond.”
Furthermore, by its terms Section 10506-26, General Code, relates to “a surety of a fiduciary or the executor or administrator of a surety” and not to.a surety of a deceased fiduciary. This is made quite apparent by Section 10506-27, General Code, which provides that “a fiduciary at any time may make application to the proper Probate Court for the release of hi¿ sureties,” and Section 10506-28, General Code, referring to “such fiduciary” giving a “new bond. ’ ’
The words of these statutory sections c.ertainly do not justify an inference that the General Assembly intended to prohibit any compromise or settlement, pur *396 suant to other statutes such as Section 10509-72, General Code, of claims against the surety of a deceased fiduciary.
Section 10506-55, General Code, does say that a “vacancy” (such as death of a fiduciary) “and the appointment of a successor fiduciary shall not affect the liability of the former fiduciary, or his sureties.” Ixi the instant case we do not have merely a vacancy and the appointment of a successor fiduciary. We have also a compromise and settlement by the successor fiduciary of all claims against the surety of the former fiduciary. Here again, the words of the statute certainly do not justify an inference that the General Assembly intended to prohibit any compromise or settlement, pursuant to other statutes such as Section 10509-72, General Code, of claims against the surety of a deceased fiduciary.
Likewise, there are no words in Section 10506-40, General Code, as it existed on July 16, 1943, or as- it was amended from time to time thereafter, which can justify -an inference that the General Assembly intended to prohibit any compromise or settlement, pursuant to other statutes such as Section 10509-72,'Gen-eral Code, of claims - against the surety of. a deceased fiduciary.
It follows,- therefore, that the Probate Court had jurisdiction to make the order which it made on-July 16, 1943, approving the application of the administrator de bonis non for authority to compromise and settle all claims against the surety of the deceased executor and to give that surety a general release-from all liabilities under its bond. The question remains whether Grant Haserodt, as- administrator de bonis non, is entitled to call upon the equity power of the court to vacate that order of July 16, 1943, because it was made under a misapprehension as to existing facts. - -
*397 The administrator de bonis non cannot seek to vacate that judgment by following the procedure outlined in Section 11631, General Code. By the provisions of Section 11640, General Code, the proceedings to vacate, with respect to the grounds specified in paragraph numbered three of Section 11631, General Code, “must be commenced within three years ’* * * after the defendant has notice of the judgment” and, with respect to the other possibly applicable provisions of Section 11631, General Code, “within two years after the judgment was rendered, or order made.”
It is argued, however, that the Probate Court has equitable power, apart from statute, to vacate its order of July 16,1943. However, it is elementary that a court of equity will not, in the exercise of its equity powers, relieve a party from the consequences of a judgment against him if such party has not been diligent and free from fault or if he has been guilty of laches. See for example Lieby v. Heirs of Ludlow (1831), 4 Ohio, 469, 492, 493; Green v. Dodge (1833), 6 Ohio, 80, 83, 84, 85, 25 Am. Dec., 736. See also 23 Ohio Jurisprudence, 1284, 1285, Sections 1235 and 1236.
In 31 American Jurisprudence, 224, Section 647, it is said:
“There are cases in which equitable relief against a judgment may be obtained on the ground of newly discovered evidence. This rule prevails where the newly discovered evidence is material, where it is such as to make it appear with reasonable certainty that with its aid an opposite result would have been reached upon the trial, and where the unsuccessful party at the trial had no knowledge of the newly discovered evidence and could not have discovered it by the exercise of reasonable diligence. However, if some or> all of these conditions are not fulfilled, equitable relief will be denied. This rule has been held to prevail *398 where the newly discovered evidence was within reach of the unsuccessful party before the trial and might have been produced thereat, especially when there is no suggestion of fraud, accident, mistake, or of any other circumstance preventing the party from having made the defense at law.”
Certainly there is no suggestion of anything other than the failure of the administrator de bonis non to investigate which prevented him from calling to the court’s attention the other claimed defalcations of the executor, upon which he relied in his 1953 application to vacate the order of July 16, 1943.
In the instant case, it is conceded that, on July 16, 1943, the administrator de bonis non had known for 15 years that there were ancillary administration proceedings in Indiana. Even in the 1928 inventory and appraisal of the estate, filed in the Probate Court in 1930, reference had been made to the administration proceedings in Indiana and it had been stated that “we are unable to even approximate the amount * * * that may be received therefrom. ’ ’ He had asked the executor where the money from Indiana was and had been told that there was nothing coming from that source. Assuming that he could have relied upon the executor’s representations before he knew that, as he asserted on July 16, 1943, the executor had appropriated money from the estate, how could any reasonable man have relied upon those representations when he discovered those appropriations after the death of the executor ? It would have been a relatively simple matter in 1943, as it was in 1951, to go to Indiana and check the court records there, which would have disclosed the payments to the executor in 1929. Instead, he went ahead and secured an order authorizing a complete settlement with the surety company and then waited almost ten years before instituting proceedings to set aside that order. Not only that, *399 but he waited two years after he admits that he had knowledge in 1951 of all the claimed facts upon which he relies before instituting any proceedings to set aside the order of the Probate Court or the release given pursuant thereto. How can any reasonable person say that this represents diligence and is conduct which should not bar the administrator de bonis non from the equitable relief which he now seeks ?
The facts disclosed by the record in the instant case clearly show the soundness of the so-called equitable doctrine of laches and give an excellent example of why a court of equity does and should refuse relief to a party who has delayed seeking such relief for a substantial time.
At the hearing before the Probate Court in the instant proceeding, the only evidence offered was that offered by Grant Haserodt as administrator de bonis non. We do not propose to condone the failure of the executor to file an account of his administration between his appointment in 1928 and his death in 1943. However, the record in the instant case discloses certain facts which indicate clearly that the executor, although careless in rendering accounts, probably did not appropriate to his own use anything for which he should have accounted as executor, except possibly part of the particular items which concededly were fully taken into consideration by the administrator de bonis non, the surety and the Probate Court when the Probate Court made its order of July 16, 1943, approving the compromise and settlement of all claims against that surety.
In the 1951 petition to vacate the order of July 16, 1943, it is alleged that the executor received $1,606 on July 9, 1928, and $3,120.10 on December 6, 1929, from the ancillary administrator in Indiana. It is only because of these two items, whi«h it is claimed *400 were not considered when the 1943 settlement with the surety was made, that the administrator de bonis non contended, and the Probate Court and the Court of Appeals held, that the July 16, 1943, order of the Probate Court should be vacated.
It should be observed that these two amounts total $4,726.10, which is $273.90 less than $5,000. The significance of this observation will become apparent as consideration is given to the will of the decedent and the Ohio and Indiana court records.
Item 3 of the will of Bobert Gray provides so far as pertinent:
“I give, devise and bequeath to my friend, Walter J. Jackson, of Chicago, Illinois, the sum of $5,000 to be paid out of any cash balance I may have at the time of my decease; and if I hold no cash or bank deposits at the time of my decease, then to be paid out of any other securities I may hold.”
« The court records, both in the Probate Court of Morrow County and in the Indiana ancillary administration proceedings, and all other relevant evidence in the record in the instant case necessarily lead to the conclusion that the amount of this bequest to J ackson [after deduction of the $166.13 Indiana inheritance tax thereon it would amount to $4,833.87] was paid to him by the executor; and that the only possible sources of such payment were (1) the $4,726.10 received by the executor from the Indiana ancillary administrator, and (2) the $1,950 claimed in 1943 as not accounted for by the executor and for which settlement was admittedly made by his surety paying that amount in 1943.
The Ohio inventory and appraisal was completed on July 4, 1928. The only assets listed were shares of stock in Florence Pottery Company and $124.95 cash, although it was stated in the inventory and appraisal as follows:
*401 “Decedent had a deposit in the First Trust & Savings Bank of Hammond, Ind. to which decedent owed a small amount. Said bank has been appointed administrator with the will annexed to administer on said Indiana assets, and we are unable to even approximate the amount, if anything, that may be received therefrom. We therefore have not taken it into consideration on this appraisement but leave it to be reported to the court by this executor when he has received same from said administrator.”
This inventory and appraisal was not filed in the Probate Court of Morrow County until February 26, 1930. The reason for this delay is apparent from the Indiana and Ohio Probate Court records.
There is a receipt dated July 9,1928, signed by Grant H. Haserodt for $1,606 on account of funeral expenses. This is voucher No. 1 in support of the Indiana administrator’s final report and account. It may be observed that that account indicates payment on some unnamed date to Wieland, as executor, but there is another recorded undated document, filed with and at the end of the filing of all the vouchers in support of the final report and account, which is a bill from the Florence Pottery Company to the estate of Eobert Gray for $1,606 and which has on it an “O. K.” followed by the signature of the executor: Haserodt’s testimony does not in any way explain this receipt or the bill from the pottery company but we will assume for the purposes of this opinion that the $1,606 was actually paid to the executor although that would appear somewhat doubtful in view of the Indiana court records.
The Indiana court records also contain a receipt dated December 6, 1929, for $3,120 signed by Wieland as executor for “the balance of said estate in the hands of said administrator as shown by said administrator’s final report and account filed herein.”
*402 All these vouchers and receipts were filed in the Indiana court on February 20, 1930.
The Indiana court records indicate that Walter Jackson, the legatee under item 3 of the will of the decedent, was very diligent in enforcing any rights which he thought he had. For example, he took a judgment on a note of the decedent and collected it in the Indiana administration proceedings. Also, it is significant that the Indiana court assessed an inheritance tax with respect to the amount distributable in the Indiana proceedings because it considered all that amount as something that would pass to Walter Jackson as legatee under item 3 of the decedent’s will.
It is quite certain therefore that Walter Jackson did something about collecting his $5,000 legacy. The amounts of $3,120.10 and $1,606 were obviously insufficient to pay that legacy in full. If the legacy was paid it would, therefore, have been necessary for the executor, in order to satisfy the legacy, not only to use all those amounts but also to dip into the $1,950, which his surety was required to account for- and pay up in 1943.
That the legacy must have been satisfied is also apparent from several documents and orders of the Morrow County Probate Court appearing in the records of that court.
On February 25, 1930, the executor filed two applications for distribution in kind of stock of the Florence Pottery Company to Grant Haserodt. In the first of these, it is stated “that after the payment of certain bequests in stock Grant H. Haserodt is entitled, as residuary legatee, to the balance of said stock,” and in the second it is stated that “Grant H. Haserodt * * * is entitled to distribution of the whole of said stock after payment of various small legacies in stock amounting in the aggregate to” a certain number of *403 shares. Attached to each of these petitions was the written agreement of Grant Haserodt to the partial distribution proposed. Each of these applications was granted by order of the court on February 25, 1930, and the records of the court also contain entries of February 25, 1930, approving the distribution of the stock made by the executor to Grant Haserodt in accordance with those orders.
If, on February 25,1930, the executor had not theretofore paid to Walter Jackson what was due him on account of his $5,000 legacy, obviously the foregoing allegations in the petition, which were consented to by Grant Haserodt, would not have been accurate and distributions to him as residuary legatee should not and probably would not have been made. These applications, therefore, and the consents of Grant Haserodt and the actions of the court all indicate that the Walter Jackson legacy of $5,000 had probably been satisfied on February 25, 1930, or prior thereto. The only possible sources of its satisfaction were the monies received by the executor from the Indiana ancillary proceedings and the monies for which the executor’s' surety was required to account in 1943. It is difficult to believe that in 1930 Grant Haserodt did not know that all the money which had been received from the Indiana ancillary administration proceedings had been used up to satisfy in part the $5,000 bequest to Walter Jackson.
Again in 1936, the executor filed another application with respect to the pottery company stock. In this application, he stated “that certain devisees under the will of said Robert Gray are entitled to a distribution of said stock under said will,” and, after referring to the number of shares to which each was entitled, stated that “Grant H. Haserodt is entitled, under the will, to the balance of said stock. ’ ’ The executor then *404 prayed for an order distributing all the stock except a-very few shares to be left in the hands of the executor “for any possible costs and further expenses.”
The Probate Court records contain an answer of Grant Haserodt to this application which states that “the allegations in the application * * * are true as set forth therein,” but questions the necessity of retaining any of the stock “for any possible costs and further expenses inasmuch as all the assets in the estate have been liquidated and all liabilities long since paid, or pleading in the alternative, that the liabilities should have been paid prior to this time.”
The Probate Court granted the application of the executor and authorized him to retain a few shares of the pottery company stock “for any possible costs and further expenses.”
The testimony of Grant Haserodt in 1953 does not and nothing in the record in the instant case does explain why he signed the voucher No. 1 receipt of July 9, 1928, for $1,606 which is on file in the Indiana court proceedings. Also, that testimony does not and nothing in the record in the instant case does explain why he took the position in 1930 and again in 1936 that, except for the specific legacies of stock in the pottery company, he as residuary legatee was entitled to the balance of the pottery company stock, notwithstanding the $5,000 bequest in the will to Walter Jackson.
We are inevitably led to the conclusion from the court records in Indiana and in the Morrow County Probate Court that in 1943 Grant Haserodt was satisfied that the executor had properly applied what he got from the Indiana ancillary administration proceedings, because Haserodt undoubtedly then remembered that the amounts so received had been used in 1930 to pay off the Walter Jackson legacy and enable Haserodt to get the pottery company stock. For this *405 reason, in 1943 he only complained about the executor’s failure to account for the proceeds from the sale of the Cadillac, $124.95 of specie listed in the inventory and the $645.23 Illinois bank account, when he asked authority to settle with the executor’s surety for $1,950. Apparently, when he. testified in the instant proceedings almost ten years later, he had forgotten what he remembered at the time he made the 1943 settlement.
The records of the Morrow County Probate Court and of the Indiana court, including the signed consents and receipts therein, unexplained as they are, clearly demonstrate the soundness of applying the doctrine of laches to deny to the administrator de bonis non equitable relief in setting aside the 1943 order. In 1943, he was satisfied with the settlement which that order authorized; and the court records which he has introduced in the instant case indicate that he should have been. Apparently, he is not satisfied now only because his memory does not have in it the recollection of transactions which occurred 23 years before, which he remembered 10 years ago, and which are clearly indicated by the court records which he introduced into evidence.